IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MARTHA JULIA HIDALGO VILLAFANE, Individually, As Executor and as Personal Representative of the Estate of Martha Erika Alonso Hidalgo, | : : : : : | CIVIL ACTION |
|  | : | NO. |
| MA. GUADALUPE NANCY CANALES ELIZALDE, Individually, as Executor and as Personal Representative of the Estate of Marco Antonio Tavera Romero, | : : : : | JURY TRIAL DEMANDED |
|  | : | |
| LOURDES FRANCISCA MENDOZA HERNANDEZ, Individually, as Executor and as Personal Representative of the Estate of Hector Baltazar Mendoza, | : : : : | |
|  | : | |
| v. | : : | |
| AGUSTAWESTLAND PHILDELPHIA CORPORATION | : : : | |
| and | : : | |
| LEONARDO S.p.A. | : : | |

**COMPLAINT**

**The Parties**

1.      Plaintiff, Martha Julia Hidalgo Villafane, is the mother of Martha Erika Alonso Hidalgo, deceased, and resides at Av. Del Zodiaco No. 8, Bosques de la Calera, Puebla, Puebla, Mexico.  Martha Julia Hidalgo Villafane was duly appointed executor of the Estate Martha Erika Alonso Hidalgo by the Head Notary of the City of Puebla de Zaragoza on January 19, 2019.

2.      Marta Julia Hidalgo Villafane has applied for and/or will be and/or has been recognized as the foreign fiduciary of the Estate Martha Erika Alonso Hidalgo by the Register of

Wills in Philadelphia County, Pennsylvania.  Plaintiffs have used every best effort to gain recognition despite the challenging circumstances of COVID-19, which has impacted operations of the Philadelphia County Register of Wills, and severely impacted travel between Mexico and the United States, and the Mexican judicial system.

3.       Plaintiff, Ma. Guadalupe Nancy Canales Elizalde, is the wife of Marco Antonio Tavera Romero, deceased, and resides at Alamos #1 Parque Sonora, Lomas de Angelopolis, Santa Clara Ocoyucan, Puebla, Mexico.  Maria Guadalupe Nancy Canales Elizalde was duly appointed executor of the of the Estate of Marco Antonio Tavera Romero by First Civil Court of the Civil District of Cholula, Puebla, on June 3, 2019

4.       Ma. Guadalupe Nancy Canales Elizalde has applied for and/or will be and/or has been recognized as the foreign fiduciary of the Estate Martha Erika Alonso Hidalgo by the Register of Wills in Philadelphia County, Pennsylvania.  Plaintiffs have used every best effort to gain recognition despite the challenging circumstances of COVID-19, which has impacted operations of the Philadelphia County Register of Wills, and severely impacted travel between Mexico and the United States, and the Mexican judicial system.

5.       Plaintiff, Lourdes Francisca Mendoza Hernandez, is the mother of Hector Baltazar Mendoza, deceased, and resides at Carretera Tehuacan, Teotitlan KM 15, Col. Centro, Altepexi, Puebla, Mexico 75950.  Lourdes Francisca Mendoza Hernandez's husband, Angel Dario Baltazar Correio, was duly appointed executor of the Estate Hector Baltazar Mendoza by Supreme Court of Justice, Second Family Court of the State of Puebla, Mexico on October 11, 2019, but died of COVID-19 on July 4, 2020.  Plaintiff Lourdes Francisca Mendoza Hernandez will be duly appointed as successor executor in due course and brings this action as the Executor of the Estate of Hector Baltazar Mendoza, deceased.  Plaintiffs have used every best effort to gain recognition

as successor administrator/executor despite the challenging circumstances of COVID-19, which has severely impacted travel between Mexico and the United States, and the Mexican judicial system.

6.      Lourdes Francisca Mendoza Hernandez will file for and be recognized as the foreign fiduciary of the Estate of Hector Baltazar Mendoza by the Register of Wills in Philadelphia County, Pennsylvania in due course.  The Estate of Hector Baltazar Mendoza is not indebted to any person in Pennsylvania.

7.      On December 24, 2018, Plaintiffs' decedents, Martha Erika Alonso Hidalgo, Marco Antonio Tavera Romero and Hector Baltazar Mendoza, were passengers aboard an Agusta A109S helicopter, registration no. XA-BON, serial no. 22174 ("the Subject Helicopter" or "Subject Agusta Helicopter"), which crashed near Santa Maria Coronango, Puebla, Mexico killing all onboard ("the Subject Crash" or "the Subject Flight").

8.      Defendant AgustaWestland Philadelphia Corporation (hereafter "Agusta"), formerly known as Agusta Aerospace Corporation, is believed and therefore averred to be a corporation exiting under the laws of the state of Delaware with a principal place of business in Pennsylvania at 3020 Red Lion Road, Philadelphia, PA 19114.

9.      Agusta is the assembler, seller, maintainer, overhauler, product supporter, and aftermarket supplier of the Agusta A109S helicopter model, including but not limited to its helipilot (or autopilot) computer and/or flight director system, including the stability augmentation systems ("SAS") and associated actuators, involved in the Subject Crash giving rise to this litigation.  It is believed and therefore averred that with respect to the Subject Helicopter, Agusta did import it into Pennsylvania, sell it from Pennsylvania, perform final assembly in Pennsylvania, provide maintenance services, acquire after-market replacement parts, overhauled certain

components of the helicopter, and provided and/or distributed product support materials in the form of updated publications, manuals, bulletins, instructions and warnings averred to be causative of the Subject Crash.

10.     Defendant Leonardo S.p.A. (hereafter "Leonardo"), formally known as Agusta Westland S.p.A., is believed and therefore averred to be a company existing under the laws of the country of Italy with an address at Piazza Monte Grappa n.4, 00195 Rome, Italy.

11.     Leonardo, is the seller, manufacturer, designer, assembler, type certificate holder, and product supporter of the Agusta A109S helicopter and its components, including but not limited to its helipilot (or autopilot) computer and/or flight director system, including the SAS and associated actuators, involved in the Subject Crash giving rise to this litigation.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the Plaintiffs, who are all citizens and residents of Mexico, and Defendants, who are citizens of Pennsylvania and Italy, and the amount in controversy exceeds $75,000.

13.     Defendants are subject to general personal jurisdiction in Pennsylvania. Defendant Agusta maintains its principal place of business in Pennsylvania. Defendant Leonardo through agency, joint venture, alter ego, or through contractual relationship maintains systematic and continuous contacts with Pennsylvania through its dealings with and control over Defendant Agusta.

14.     Defendants are subject to specific personal jurisdiction in Pennsylvania because the defective product(s) entered the marketplace in Pennsylvania through long term import/export arrangements, agency, joint venture, or otherwise between Defendant Leonardo and Defendant

Agusta.  Defendant Leonardo controls the distribution of its products, which include the end assembled helicopter and the ongoing product support materials in the form of updated publications, instructions and warnings, and caused its products to be shipped to and/or distributed from Agusta in Philadelphia, where it is believed and therefore averred that final assembly on the Subject Helicopter took place.  Ongoing product support for the Subject Helicopter in the form of updated publications, manuals, instructions and warnings emanated from and/or were distributed by Agusta in Pennsylvania, and were causative of the Subject Crash that occurred in another State due to these acts and omissions occurring within the Commonwealth of Pennsylvania, therefore subjecting the defendants to Pennsylvania's Long Arm Statute.  The cause of actions asserted here arise out of or are related to the defendants' forum related contacts.

15.     Exercising personal jurisdiction over the defendants is fair, and consistent with due process and notions of fair play and substantial justice. All defendants develop a significant line of revenue from their Pennsylvania contacts, maintaining offices here; litigating in Pennsylvania is not burdensome, in this age is done electronically and through counsel locally retained, and does not impose an undue burden. Pennsylvania also has a very significant interest in the subject matter of this litigation as the defective product at issue in this lawsuit is imported for distribution to the western hemisphere, including but not limited to the country of Mexico, through the Commonwealth of Pennsylvania. Leonardo's presence in the western hemisphere is viewed as existing in Pennsylvania through its domestic product support and seller Agusta.

16.     Pennsylvania is also a convenient jurisdiction as it is home to defendant Agusta, whose conduct caused the defective product to be sold, distributed, and/or supported aftermarket, conducted final assembly and participated in the shipment of defective products, including but not limited to publications, manuals, instructions and warnings. Pennsylvania is also a convenient

forum due to its accessibility, court system, presence of witnesses, and extensive experience with aviation matters.  Furthermore, through its distribution system extending through Pennsylvania and its product support arm headquartered in Pennsylvania, it is believed and averred that Leonardo has earned millions of dollars in revenue through its presence in this Commonwealth. Upon information and belief, and again owing to the presence of Agusta here in Pennsylvania, Agusta agents and employees regularly travel to Pennsylvania to further their economic interests in the manufacture, sale, and support of the Leonardo model helicopters sold through this Commonwealth.

17.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c)(2)-(3) and (d) because defendant Agusta has its principal place of business in the Eastern District of Pennsylvania at its headquarters in Philadelphia. Also, it is believed and averred that the Subject Helicopter was shipped from Europe by Leonardo to Agusta in Philadelphia where it underwent final assembly, and was sold and/or distributed to its first purchaser, and because all defendants regularly conduct business in this judicial district.

### Background Facts

18.     Leonardo is the type certificate holder, manufacturer, seller, and product supporter of the Agusta A109S helicopter.

19.     The A109S helicopter is a twin engine multi-purpose helicopter which is manufactured primarily in Italy and exported to the United States and other North American destinations, including Mexico, through Leonardo's support agent, Agusta, in Philadelphia, Pennsylvania.

20.     The Subject Helicopter was first purchased by one Mexican company, and then sold to another Mexican company, both of whom utilized the Subject Helicopter for charter flights.

21.     It is believed and therefore averred that the Subject Helicopter was sold to its first purchaser from Agusta in Philadelphia.

22.     It is a believed and therefore averred that Defendant Agusta provided maintenance and technical services to the helicopter owner and/or maintainer during which events it had the opportunity to disclose the existence of defects addressed in this lawsuit.

23.     The Subject Agusta Helicopter maneuvers in airspace, in part, through a hydraulic actuation system which pivots the main rotor assembly and/or blades in various directions in response to control inputs by the pilots and/or the helipilot (autopilot) system.

24.     The helipilot system has a number of modes, including stability augmentation ("SAS").

25.     When SAS mode is active, the helipilot provides short term stabilization inputs to counteract external disturbances such as a sudden gust of wind.  This dampens the effect of these disturbances and is meant to reduce pilots' workloads.

26.     The helipilot system accomplishes this stability augmentation through two helipilot computers, each with their own associated linear actuators for pitch and roll axes.  In other words, there are two helipilot computers, two linear actuators controlling the pitch axis, and two linear actuators controlling the roll axis.  The helipilot actuators command the main rotor hydraulic actuators to pivot the helicopter's rotor and maneuver the helicopter on their respective axis when commanded by the helipilot.  The dual helipilot computers and their associated actuators are referred to as SAS1 and SAS2.  Both SAS1 and SAS2 are designed and intended to be capable of stabilizing the helicopter on their own.

27.     On December 24, 2018, two of plaintiffs' decedents, Martha Erika Alonso Hidalgo and Hector Baltazar Mendoza, were passengers aboard the Subject Helicopter, and the third

decedent, Marco Antonio Tavera Romero, was serving as co-pilot, during a flight from the Puebla, Mexico, to Mexico City.

28.     The crew of the Subject Helicopter is believed and therefore averred to have been operating the helicopter "hands off" through its helipilot/autopilot system.

29.     During the flight, one or both the SAS1 and SAS2 roll actuators malfunctioned, extended, and caused the helicopter to roll left and exit controlled flight.

30.     The pilots were unable to recover control of the helicopter after the helipilot system and the linear roll actuator(s) malfunctioned, the helicopter went "hardover" flipping upside down and crashed into terrain, killing all those onboard, including plaintiffs' decedents.

31.     Prior to the Subject Flight on or about December 13, 2018, the roll actuator in the Subject Helicopter's SAS2 was found to be not functioning properly and in need of repair.

32.     Even though this key system was found to be functioning improperly, the Master Minimum Equipment List published and/or distributed by Leonardo and Agusta advised the Subject Helicopter's maintainers and operators that it could continue to be flown with only one properly functioning SAS under certain conditions.

33.     Leonardo and Agusta further did not provide any other instructions or warnings concerning the danger of operating without both SAS systems and their associated actuators properly functioning.

34.     After the crash, it was determined that the other roll actuator in SAS1 was also defective.  Two screws within the actuator's casing were completely unscrewed and moving freely within the actuator.  These loose screws could contact other components and electrical terminals within the actuator, causing un-commanded extensions of the actuator to its full displacement and therefore full left roll within less than a second.

35.     The roll actuator in SAS1 was never overhauled, repaired or replaced after the Subject Helicopter was manufactured, and was therefore original to the Subject Helicopter and in the same defective condition it was in when it left defendants' Leonardo's and Agusta's hands.

36.     As a direct and proximate result of the acts and/or omissions of the defendants, jointly and severally, there was a measureable and significant period of time before the crash, as well as before the death of plaintiffs' decedents, during which they sustained personal injuries, including conscious and physical pain and suffering, pre-impact fright and terror, fear of impending death, post-impact fright and terror, mental anguish, emotional distress, the physical manifestation of personal injury due to the extreme terror and freight experienced, and other severe injuries for a measureable period of time prior to their death.

37.     Defendants were aware and had prior notice of the propensity of the Subject Helicopter to experience a hard over through failure of the roll and similarly designed pitch linear actuator systems.

38.     Such notice was provided to defendants through at least two prior incidents involving substantially similar A109 helicopters that occurred in Alexandria, MN and Eastland, TX.  Both events involved un-commanded movements of the roll and/or pitch linear actuator which placed the helicopters in unusual attitudes, beyond the pilot's ability to control and beyond reasonable reaction times for pilots to recognize before departure from controlled flight was imminent.

39.     Instead of informing regulatory authorities, maintainers and operators of design defects existing in the Subject Helicopter, Defendants concealed such information and instead amended the Master Minimum Equipment List as an ineffective "band-aid" to the problem without

disclosing the dangers known to the Defendants, despite their knowledge that the failure could occur in flight and the immanency of which could not be detected pre-flight.

40.     The Subject Helicopter model was permitted to operate despite having a condition which rendered it incapable of meeting the minimum safety standards for certification as it concerns hardover and controllability.

41.     This action is brought pursuant to the Wrongful Death and Survival Statutes of the Commonwealth of Pennsylvania and/or any other applicable law, for all damages which are or may be recoverable under said statutes and laws, including but not limited to loss of past earnings, loss of future earnings and earning capacity, loss of enjoyment of life, loss of life's pleasures, fear of impending death, conscious and physical pain and suffering, mental anguish, emotional injuries, pre-impact and post-impact fright and terror, as well as the loss of decedent's care, comfort, companionship, support, society, love, advice, guidance, counsel and services, and loss of consortium, together with the pecuniary value of the loss thereof, as well as for funeral and interment expenses, estate expenses and such other damages as are or may be provided for by applicable law, as well as for punitive damages to the extent recoverable under applicable law for the outrageous, willful, wanton and reckless conduct as hereinafter described by the defendants, and each of them.

42.     As a result of the foregoing, plaintiffs, and all those beneficially interested in the claims for the wrongful deaths of their decedents, have suffered severe and devastating grief and emotional distress as a result of the decedents' catastrophic and fatal injuries, as well as the loss of their decedents' care, comfort, companionship, support, society, love, advice, guidance, counsel and services, all for which recovery of damages is being sought.

## COUNT ONE
## STRICT LIABILITY
### (Plaintiffs v. Leonardo and Agusta)

43.     Plaintiff incorporates averments 1 through 42 and incorporates them in full into this count.

44.     Leonardo is in the business of manufacturing, designing, testing, inspecting, supporting, and selling helicopters, including the Agusta A109S, and did so with respect to the Subject Helicopter involved in the Subject Crash, which killed plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero.

45.     Agusta is in the business of assembling, selling, distributing, maintaining, and supporting Agusta A109S helicopters (and all other models of Agusta helicopters) manufactured by Leonardo and did so with respect to the Subject Helicopter involved in the Subject Crash, which killed plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero.

46.     Leonardo and Agusta, as type certificate, repair station certificate, or other regulatory certificate holders, are responsible for assuring the continuing airworthiness of the Subject Helicopter and its component parts to ensure that they are safe for flight.

47.     These defendants are also responsible for formulating and distributing appropriate operating instructions, maintenance instructions and instructions for continuing airworthiness for the Subject Helicopter and its component parts to ensure that they are and remain safe for flight.

48.     Leonardo and Agusta, designed, developed, manufactured, assembled, inspected, tested, distributed, licensed, sold, supplied, overhauled, rebuilt, serviced, supported, maintained, modified and/or repaired the helicopter main rotor actuation system, and helipilot/autopilot system, and other components and parts, which were defective, unreasonably dangerous, and unfit for operation in a helicopter.

49.     These dangers and defects are/were unknowable and unacceptable to the average ordinary consumer and a reasonable person would conclude that the probability and seriousness of harm caused by the product(s) outweigh the burden or costs of taking precautions.

50.     The design and/or manufacturing defects that existed in the subject helicopter and/or its components include:

a.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, incapable of safely actuating the main rotor system during all phases of flight;

b.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter main rotor actuation system, which cannot be overpowered or controlled by an average ordinary competent pilot;

c.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter main rotor actuation system, which cause such rapid departure from controlled flight that they cannot be detected by the average pilot in time for appropriate evasive action;

d.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter when there is no system, limiter, monitor, or other safety detection device to immediately disable and/or limit movement of the system when such dangerous commands are implemented.

e.      helipilot/autopilot/stability augmentation systems, which includes the computer, flight director, and actuators, that contain material selection deficiencies, metallic hardening deficiencies, and incompatible materials;

f.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that contain gears and/or moving parts improperly coated, heat treated, or otherwise manufactured/designed subjecting them to seizure, delaminating, jamming, or otherwise susceptible to failure;

g.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that are not designed to fail safe which when experiencing a malfunction will oscillate, extend, and/or retract in manners exposing the occupants to harm and rendering the helicopter uncontrollable;

h.      helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, equipped with movable parts of a design subject to pitting, seizing, fracturing;

i.      helipilot/autopilot/stability augmentation systems, which includes the computer, flight director, and actuators, equipped with components susceptible to stickage, hanging, blockage, sudden release, un-commanded behavior all inducing hardover and/or hardover coupled with sudden release;

j.      helipilot/autopilot/stability augmentation system containing screws and/or parts improperly coated, heat treated, or otherwise manufactured/designed subjecting them to loosening, undesirable conduction across unprotected circuit board terminals and initiation of unintended and hazardous inputs; and seizure, delaminating, jamming, or otherwise susceptible to failure into the helicopter design;

k.      helipilot/autopilot/stability augmentation systems lacking all necessary warnings and instructions to make it safe for use in helicopter flight, including but not limited to a

warning/instruction that the helicopter was not safe for flight with only a single functional SAS and/or that the helicopter should only be flown with both SAS functioning properly.

51.     These dangers and defects are unreasonable, unknowable, and unacceptable to the average or ordinary consumer or user, such as plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero.

52.     A reasonable person would conclude that the probability and seriousness of harm caused by these products outweigh the burden and/or the costs of taking precautions and correcting the defects.

53.     Feasible and alternative designs which ameliorated the danger and/or corrected the design defects existed in the industry and/or were technologically feasible under the standards in place at the time of the accident, at the time of manufacture, and the time of design conception.

54.     As a direct, proximate, legal, and/or contributing cause of the foregoing defects, the Subject Helicopter departed controlled flight and crashed to the ground, killing plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero, and causing the damages claimed in this lawsuit.

WHEREFORE, Plaintiffs demand judgment against these Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) plus interest, delay damages, costs, attorney's fees and such other relief as the Court deems appropriate.

**COUNT TWO**
**NEGLIGENCE**
**(Plaintiffs v. Leonardo and Agusta)**

55.     Plaintiff incorporates averments 1 through 54 and incorporates them in full into this count.

56.     As a manufacturer, type certificate holder, designer, seller, product supporter,

maintainer, overhauler, and/or distributor of helicopters, helicopter component parts, and/or services associated with the continuing airworthiness of helicopters, defendants Leonardo and Agusta had duties imposed upon them by common law and regulatory law, and were required to carry these duties out professionally, prudently, and in a manner that would not cause a dangerous product to enter or remain in the marketplace.

57.     Defendants Leonardo and Agusta breached the duties that they owed to plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero, and were negligent, grossly negligent, careless, and reckless by virtue of the following:

a.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer, flight director, and actuators, in a manner rendering them incapable of safely actuating the main rotor system during all phases of flight;

b.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer, flight director, and actuators, in a manner that induces un-commanded control inputs to the helicopter main rotor actuation system which cannot be overpowered or controlled by an average ordinary competent pilot;

c.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter main rotor actuation system which cause such rapid departure from controlled flight that they cannot be detected by the average pilot in time for appropriate evasive action;

d.      designing, manufacturing, selling, supporting, and/or maintaining a

helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter when there is no system, limiter, monitor, or other safety detection device to immediately disable and/or limit movement of the system when such dangerous commands are implemented;

e.     designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer, flight director, and actuators, in a manner that contains and/or failed to remove material selection deficiencies, metallic hardening deficiencies, and incompatible materials;

f.     designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes servos, actuators, and/or servo actuators equipped with pistons, rods and/or springs improperly coated, heat treated, or otherwise manufactured/designed subjecting them to seizure, delaminating, clogging of hydraulic lines, or otherwise susceptible to failure;

g.     designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators equipped with seals that are incapable of performing their intended function due to rupturing, leaking, or otherwise failing;

h.     designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators not designed to fail safe which when experiencing a malfunction will oscillate, extend, and/or retract uncontrollably and/or intermittently in manners exposing the occupants to harm and rendering the helicopter uncontrollable;

i.     designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators equipped with pistons, rods, and/or springs or other movable parts of a design subject to pitting, seizing, fracturing;

j.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes servos, actuators, and/or servo actuators equipped with piston(s), rods, and/or springs susceptible to stickage, hanging, blockage, fracture, sudden release, uncommanded behavior all inducing hardover and/or hardover coupled with sudden release;

k.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system which was sold without all necessary warnings and instructions to make it safe for use in helicopter flight;

l.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes computer, flight director, and actuators that induces hardover, run away movement of the autopilot servos and motors, or otherwise causes the uncontrollability without the appropriate safety features to prevent such occurrences;

m.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system lacking all necessary warnings and instructions to make it safe for use in helicopter flight;

n.      failing to properly design, maintain, install, inspect, service, remove from service, component parts of the helicopter that were not in a condition safe for flight, which fell below manufacturer service limits, which were on the verge of malfunctioning including the main rotor actuation system and the components thereof, and the helipilot/autopilot/stability augmentation system and the components thereof;

o.      failing to provide adequate instruction and requirements, warnings and continuing airworthiness information concerning the helicopter, its component parts, main rotor system, and/or helipilot/autopilot/stability augmentation system;

p.      failing to correct known defects and deficiencies in the subject helicopter, its component parts, main rotor servo, hydraulic system, and/or helipilot/autopilot/stability augmentation system;

q.      certifying the subject helicopter, helipilot/autopilot system/stability augmentation system, and parts thereof, including actuators, as airworthy, when they were not;

r.      failing to design the subject helicopter, helipilot/autopilot system/stability augmentation system, and parts thereof, including actuators, with sufficient redundancy and annunciation;

s.      failing to select and/or design the helipilot/autopilot/stability augmentation system so it was capable of safely actuating the main rotor system during all phases of flight;

t.      failing to select and/or design the helipilot/autopilot/stability augmentation system to not induce un-commanded control inputs to the helicopter main rotor actuation system which cannot be overpowered or controlled by an average ordinary competent pilot;

u.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot stability augmentation system containing material selection deficiencies, metallic hardening deficiencies, and incompatible materials into the helicopter design;

v.      failing to ensure against and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system containing screws and/or parts improperly coated, heat treated, assembled or otherwise manufactured/designed subjecting them to loosening, undesirable conduction across unprotected circuit board terminals and initiation of unintended and hazardous inputs; and seizure, delaminating, jamming, or otherwise susceptible to failure into the helicopter design;

w.      failing to ensure and or prevent the incorporation of a

helipilot/autopilot/stability augmentation system that was not designed to fail safe which when experiencing a malfunction will oscillate, extend, and/or retract in manners exposing the occupants to harm and rendering the helicopter uncontrollable;

   x. failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system equipped with movable parts of a design subject to pitting, seizing, fracturing;

   y. failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system equipped with components susceptible to stickage, hanging, blockage, sudden release, uncommanded behavior all inducing hardover and/or hardover coupled with sudden release;

   z. failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system lacking all necessary warnings and instructions to make it safe for use in helicopter flight;

   aa. failing to ensure and/or prevent the incorporation of a rate gyro and/or vertical gyro capable and susceptible to intermittent immediate, and/or unanticipated failure due to defects in material selection, specifications, tolerances, lack of warnings, lack of proper instructions, stickage of movable parts, and lack of redundancy.

 58. The defendants' conduct with respect to the foregoing breaches fell below the applicable standard of care.

 59. As a direct, proximate, legal, and/or contributing causal result of the foregoing breaches of duties owed to Plaintiffs by these defendants, the subject helicopter departed controlled flight and crashed to the ground killing plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector

Baltazar Mendoza, and Marco Antonio Tavera Romero, and causing the damages claimed in this lawsuit.

WHEREFORE, Plaintiffs demand judgment against these Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) plus interest, delay damages, costs, attorney's fees and such other relief as the Court deems appropriate.

### COUNT THREE
### BREACH OF WARRANTIES
### (Plaintiffs v. Leonardo and Agusta)

60.    Plaintiff incorporates averments 1 through 59 and incorporates them in full into this count.

61.    Defendants Leonardo and Agusta are in the business of being a manufacturer, type certificate holder, designer, seller, product supporter, maintainer, overhauler, and/or distributor of helicopters, helicopter component parts, and/or services associated with the continuing airworthiness of helicopters.

62.    Defendants Leonardo and Agusta described and advertised their goods and services for sale.

63.    These descriptions and affirmations concerning the goods and services resulted in express and implied warranties that the goods were airworthy, merchantable, fit for their purpose, and safe for their intended use.

64.    Plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero were a members of the class of persons to whom these warranties were intended to benefit and protect and these warranties ran to them directly and/or as a third-party beneficiaries.

20

65.     Plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero further relied upon these warranties in boarding the Subject Helicopter.

66.     As a result of their sales activities, the Defendants Leonardo and Agusta impliedly warranted that their goods were fit for their particular purpose, and that their skill and judgment would be relied upon and were, in fact, relied upon by the purchaser of their individual goods. These implied warranties ran from Defendants to Plaintiffs' decedents.

67.     In addition to goods being offered, the Leonardo and Agusta defendants also advertised and offered their services, such as maintenance, inspection, replacement of components, and updating of warnings, manuals and instructions which they represented would be performed/provided in a workmanlike, professional, and manner in accordance with the guidelines and instructions applicable to such services.

68.     Because the Defendants Leonardo and Agusta are merchants as to their goods and services offered for sale, there arises as a result of the "course of dealings" and "usage of trade" an implied warranty that each of their individual goods and services are safe.  These implied warranties ran to Plaintiffs' decedents.

69.     The Defendants breaches of warranties included the following:

a.     designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer, flight director, and actuators, in a manner rendering them incapable of safely actuating the main rotor system during all phases of flight;

b.     designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer,

flight director, and actuators, in a manner that induces uncommanded control inputs to the helicopter main rotor actuation system which cannot be overpowered or controlled by an average ordinary competent pilot;

      c.    designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter main rotor actuation system which cause such rapid departure from controlled flight that they cannot be detected by the average pilot in time for appropriate evasive action;

      d.    designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation systems, which include the computer, flight director, and actuators, that induce un-commanded control inputs to the helicopter when there is no system, limiter, monitor, or other safety detection device to immediately disable and/or limit movement of the system when such dangerous commands are implemented;

      e.    designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes, but is not limited to, a computer, flight director, and actuators, in a manner that contains and/or failed to remove material selection deficiencies, metallic hardening deficiencies, and incompatible materials;

      f.    designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes servos, actuators, and/or servo actuators equipped with pistons, rods and/or springs improperly coated, heat treated, or otherwise manufactured/designed subjecting them to seizure, delaminating, clogging of hydraulic lines, or otherwise susceptible to failure;

      g.    designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators equipped with seals that are

incapable of performing their intended function due to rupturing, leaking, or otherwise failing;

h.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators not designed to fail safe which when experiencing a malfunction will oscillate, extend, and/or retract uncontrollably and/or intermittently in manners exposing the occupants to harm and rendering the helicopter uncontrollable;

i.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes actuators, and/or servo actuators equipped with pistons, rods, and/or springs or other movable parts of a design subject to pitting, seizing, fracturing;

j.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system that includes servos, actuators, and/or servo actuators equipped with piston(s), rods, and/or springs susceptible to stickage, hanging, blockage, fracture, sudden release, uncommanded behavior all inducing hardover and/or hardover coupled with sudden release;

k.      designing, manufacturing, selling, supporting, a helicopter and main rotor actuation system which was sold without all necessary warnings and instructions to make it safe for use in helicopter flight;

l.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system which includes computer, flight director, and actuators that induces hardover, run away movement of the autopilot servos and motors, or otherwise causes the uncontrollability without the appropriate safety features to prevent such occurrences;

m.      designing, manufacturing, selling, supporting, and/or maintaining a helipilot/autopilot/stability augmentation system lacking all necessary warnings and instructions

to make it safe for use in helicopter flight;

n.      failing to properly design, maintain, install, inspect, service, remove from service, component parts of the helicopter that were not in a condition safe for flight, which fell below manufacturer service limits, which were on the verge of malfunctioning including the main rotor actuation system and the components thereof, and the helipilot/autopilot/stability augmentation system and the components thereof;

o.      failing to provide adequate instruction and requirements, warnings and continuing airworthiness information concerning the helicopter, its component parts, main rotor system, and/or helipilot/autopilot/stability augmentation system;

p.      failing to correct known defects and deficiencies in the subject helicopter, its component parts, main rotor servo, hydraulic system, and/or helipilot/autopilot/stability augmentation system;

q.      certifying the subject helicopter, helipilot/autopilot system/stability augmentation system, and parts thereof, including actuators, as airworthy, when they were not;

r.      failing to design the subject helicopter, helipilot/autopilot system/stability augmentation system, and parts thereof, including actuators, with sufficient redundancy and annunciation;

s.      failing to select and/or design the helipilot/autopilot/stability augmentation system so it was capable of safely actuating the main rotor system during all phases of flight;

t.      failing to select and/or design the helipilot/autopilot/stability augmentation system to not induce uncommanded control inputs to the helicopter main rotor actuation system which cannot be overpowered or controlled by an average ordinary competent pilot;

u.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot

24

stability augmentation system containing material selection deficiencies, metallic hardening deficiencies, and incompatible materials into the helicopter design;

v.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system containing screws and/or parts improperly coated, heat treated, or otherwise manufactured/designed subjecting them to loosening, undesirable conduction across unprotected circuit board terminals and initiation of unintended and hazardous inputs; and seizure, delaminating, jamming, or otherwise susceptible to failure into the helicopter design;

w.      failing to ensure and or prevent the incorporation of a helipilot/autopilot/stability augmentation system that was not designed to fail safe which when experiencing a malfunction will oscillate, extend, and/or retract in manners exposing the occupants to harm and rendering the helicopter uncontrollable;

x.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system equipped with movable parts of a design subject to pitting, seizing, fracturing;

y.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system equipped with components susceptible to stickage, hanging, blockage, sudden release, uncommanded behavior all inducing hardover and/or hardover coupled with sudden release;

z.      failing to ensure and/or prevent the incorporation of a helipilot/autopilot/stability augmentation system lacking all necessary warnings and instructions to make it safe for use in helicopter flight;

aa.      failing to ensure and/or prevent the incorporation of a rate gyro and/or

vertical gyro capable and susceptible to intermittent immediate, and/or unanncuated failure due to defects in material selection, specifications, tolerances, lack of warnings, lack of proper instructions, stickage of movable parts, and lack of redundancy.

70.    The Defendants' conduct with respect to the foregoing breaches fell below the applicable standard of care and constituted breaches of implied and express warranties.

71.    As a direct, proximate, legal, and/or contributing causal result of the foregoing breaches of warranties owed to Plaintiffs' decedents by these Defendants, the Subject Helicopter departed controlled flight and crashed to the ground killing plaintiffs' decedents, Martha Erika Alonso Hidalgo, Hector Baltazar Mendoza, and Marco Antonio Tavera Romero, and causing the damages claimed in this lawsuit.

WHEREFORE, Plaintiffs demand judgment against these Defendants, jointly and severally, for compensatory and punitive damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) plus interest, delay damages, costs, attorney's fees and such other relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Respectfully submitted,
KATZMAN, LAMPERT, & STOLL

By:    /s/ Bradley J. Stoll
Bradley J. Stoll, Esq.
Attorney I.D.: 89635
121 North Wayne Ave., Suite 205
Wayne, PA 19087
Phone: (610) 686-9686
Fax: (610) 686-9687
Email: bstoll@klm-law.com

Anthony Tarricone, Esq.
Vincent C. Lesch III, Esq.

KREINDLER & KREINDLER LLP
750 Third Avenue
New York, NY 10117
Phone: (212) 687-8181
Fax: (212) 972-9432
Email: atarricone@kreindler.com
Email: vlesch@kreindler.com
**Pending Pro Hac Vice Admission**

Jaime A. Gonzalez, Jr., Esq.
Catherine Smith, Esq.
GONZALEZ & ASSOCIATES LAW FIRM, PC.
Summit Park North
817 E. Esperanza, Ave.
McAllen, TX  78501
Phone: 956-664-0100
Fax: 956-664-1529
Email: jaime@jaglawfirm.com
Email: cat@jaglawfirm.com
**Pending Pro Hac Vice Admission**

Attorneys for Plaintiffs